is number 14-2405 and 14-2558. Soaring Eagle Casino at all v. NLRB are arguing not to exceed 15 minutes per side. Mr. Sutkowski for the announcement. Your Honor, the record is at 6 minutes for the vote. Thank you. Good afternoon. Before we go further today, I think it's important to take a moment and set this case in context. Imagine that it's the 1850s and you are a member of the Saginaw tribe. For generations, your family and people have lived in the forests of central Michigan. Each year, babies are born, children grow, elders die, and are buried in your homeland. But change is coming. So that you and your family may remain forever on a sliver of your homeland, you agree to surrender 7.5 million acres of land, one-third of Michigan. Through these treaties, federal negotiators promise a home that you and your people alone will control, as they have for generations. Though outsiders may enter this territory, you are promised that they may remain at your sufferance. You are promised that you retain the power to evict them if you don't want them to remain. Where do you get those promises from? Those are from the treaties and the explanations and discussions that the federal negotiators, George Minnie Penny and Henry Gilbert, gave specifically with reference to the 1855 treaty with Chippewa. Now, even if it's true that we're to interpret that treaty by reference to what would have been understood at the time, and I don't think the government really disputes that concept, isn't it true that at the time there was not an overlay of regulatory activity by the federal government or by the states that could have been taken into consideration? Not with respect to, for sure, the labor movement or labor regulations or something like the National Labor Relations Act. That wouldn't come along for another 75 years. There would have been a prescient negotiator, indeed, Your Honor, that would have been able to anticipate that that was a specific right that the tribe had to be concerned with. But what they reserved were very broad general rights, and that those were to remain in this home without being disturbed and with the assurance that they would never be allowed to lose those rights. So the general rights that you want to rely most particularly on are the right to use and exclude, right? And the right to self-government, and everything that came with that as far as their ability to both regulate and set the conditions for commercial activity that would improve the general welfare of their people, just as they had for generations before that and through various eras in history and commerce. So you think that just focusing on the treaty language alone, you think that treaty language is specific enough to say, I'll give you a hypothetical, say there's only three left in the tribe. And so everyone else that's on the land that is working the commercial activities on the land, everyone else is a nonmember. Do you think that right to exclude is so broad that we don't take that into consideration? It's what the Supreme Court has discussed in cases like Marion or Mille Lacs or Dion, Your Honor. That treaty right is broad enough to cover even things that aren't specifically mentioned in the treaty, but go to using that land and having that protection for Indian purposes. That's what the federal government was exchanging for the great sessions of land that were coming and for the changing conditions that were happening and the obligations that they had to continue to care for these peoples. You agree, would you not, that this language, this treaty language is somewhere in the spectrum between the language the Tenth Circuit was looking at in Donovan that was very specific and the cases where there is no treaty language, right? Perhaps it's somewhere between, but if you look to how the Supreme Court applies that test, U.S. v. Michigan applied in this circuit, even Kewanee Bay case applied in this circuit. They looked to see what the full extent of those rights were in U.S. v. Michigan, even though there weren't fishing rights named in the treaty, the court found that fishing rights existed in the Great Lakes. It doesn't have to enumerate every potential possibility of what the right will be, but when they basically say you have a permanent home forever, that carries with it all of these other rights and the inherent rights of self-government. Taken to its logical extreme, I'm sorry, I'll move on so everybody else can ask you questions in a minute, but taken to its logical extreme, wouldn't it be true that your view is that the treaty language that you're relying on would then exclude all regulation with respect to commercial activity and not just the particular regulations we're looking at here? Your Honor, it really goes to what it takes to abrogate these rights, and that's the clear and plain statement rule that comes out of, again, the cases like Malaxion, Iowa Mutual. If Congress is going to abrogate those rights, they're the only ones that can do that, and they have to use clear and express language, and here there just was none. If the San Manuel case from the circuit is distinguishable from your case, and if so, how, and if not, why not? San Manuel, the tribe argues that it shouldn't apply, Your Honor.  It doesn't get to the controlling Supreme Court precedent here, and it really doesn't begin to address the fact that these treaties that the tribe have are meant to last forever and that those rights are to be protected, and if Congress wants to abrogate those rights or to have a specific act apply, it can make that statement. It's the Congress's job to make that statement. Are you saying San Manuel was wrong, or you're distinguishing it on the basis that there was no treaty? Well, it can be distinguished because there was no treaty, but our position is it is wrong. It's not the right test to apply. It takes that straight statement from Tuscarora, and it kind of goes off in the direction that the Coeur d'Alene courts went as well, but what we're saying is go to Tuscarora, but apply the rule that the Supreme Court used in that case. Apply the clear and plain statement rule. It's clear you don't like the Coeur d'Alene analysis, you don't like the San Manuel analysis, which really is hard for me to understand that it's that different from Coeur d'Alene, but you don't like those two analyses, but when you say go back to the Supreme Court's decision in Tuscarora, I'm not sure what you're shooting at. What is the test? The test, just as when it analyzed, has Congress made a clear and plain statement that this act, in that case the Federal Power Act, was intended to apply to Indians, and in that case it was whether a reservation fit that definition, but they did the analysis. Only a clear and plain statement if there's either a treaty right or there's some non-treaty right that the tribe has retained, correct? That's right. Okay, so where do you figure out that underlying threshold? Assuming we don't agree that the treaty language is specific enough to be the end of the inquiry, what about the other prong of the inquiry? Where does that come from? With respect to applying the clear and plain statement test? You have to get to that test, right? In here, it's whether there was an abrogation of these tribal rights that would allow a congressional act that is silent to abrogate those rights. So there's no clear and expressed language that does that. The board isn't really entitled to any deference because it's not interpreting the act. Let me phrase that differently. Let's say there are no treaty rights. Do you still require a clear statement? That's almost a Little River case, Your Honor, in this circuit as well, where they weren't basing their arguments on treaty rights, but they get to the same analysis because it's the inherent rights of self-government that come with the establishment of a reservation that they're relying on to be able to make their own laws. So there would still have to be a clear and plain statement of abrogation. You would get to the same place in both cases. What our case has is an added layer of protection. I think that's the point we're trying to get to. What's the legal authority that we should be relying on? What test should we be employing? If it's not the Coeur d'Alene, if it's not the San Manuel, what is it? It's tests like the Dionne case that look at the act. It is really a two-step test. First, is it going to abrogate a treaty right? And if so, did Congress use clear and express language to accomplish that abrogation? That's the test that the Supreme Court always goes back to. The Supreme Court has never gone back... What if there's no treaty? What if there's no treaty? There's lots of cases out here where there's no treaty. Yes. And not every one of them, the Supreme Court has said that you don't need a clear and plain statement. So if you have no treaty, what do you do? If you look to which tribal rights are being abrogated through application of the act. If it's a sovereignty issue, if it's the rights of self-government, then it really is the same analysis. But what do you do about the analysis in the absence of treaty rights that generally said that when you're dealing with... Yes, it's relevant that it's on tribal lands, but it's also relevant that you're dealing with commercial relations with non-Indians. Don't they analyze it that way and then come to the conclusion that this is not really a matter of abrogating sovereignty? But the point is that they've not gone through the Indian law analysis to get there. Because for there, you'd have to see what was Congress's intent through the passage of this act and its intended application to Indian tribes. I don't understand why you don't focus on Montana. Montana is an example of where it's a similar situation here where there's a consistent relationship to come onto the reservation, whether to be employed or to be a patron at the casino. And you are basically saying I'm going to a different jurisdiction and I will have to abide by the rules and laws. Your Honors, I lived in Wisconsin for 20 years, across the river, and I worked in Minnesota. And I knew every day that I was going to a place where I couldn't vote, but the law still applied to me, that the rules applied to me, that Minnesota could ask me to leave if they didn't think I should be there. But I accepted that because I thought the job was worthwhile. And it's a similar situation here. It's a sovereignty jurisdictional issue. So its consensual relationship is under Montana? Yes, yes. That would basically have those non-Indian patrons or the non-Indian employees notice that they must accept the terms and conditions of the tribe to exercise its rights and do what Congress was intending that they do in the management of these facilities. So, John Jeffries, you still have your rebuttals, huh? Okay, thanks. Thank you. May it please the Court. My name is Keira Eardwall. I represent the National Labor Relations Board. Unlike the tribe's proposed approach, the Board's San Manuel jurisdictional standard accommodates all of the federal laws and policies at issue in this case, both labor and Indian. The Board first examined the National Labor Relations Act and determined reasonably that tribes qualify as an employer, a statutory employer under that Act, covered by the Act. But then the Board, as is its responsibility, looked to other areas of federal law to see if any were relevant and obviously in this case federal Indian law and policy are relevant. And the Board looked to the federal court's interpretation of that law and policy to adopt the Kirtland standard to determine whether it was precluded from exerting jurisdiction over certain enterprises. And after doing that, the test then also incorporates a further discretionary analysis under which the Board, if it determines that it is not precluded from asserting jurisdiction under Indian law, will still do a balancing of labor and Indian policies to determine whether jurisdiction is appropriate in that case. And there is a... I got the feeling you were going to take your whole time without taking a breath, so I'm just going to interrupt you. Let's begin where we ended here. I don't understand why there is... you don't even cite to Montana.  The structural framework within which we are to analyze these questions is laid out in Montana. And there were two concurrences about how that works, but everybody agreed. It's Montana. Coeur d'Alene's never cited. Tuscarora's never cited. And now we're here and you're arguing for all these things that the Supreme Court itself never has said are meaningful or important or that the methodology or structure is appropriate. So why aren't we looking at this from the lens of Montana and its analysis? Well, respectfully, I mean, I think there are two answers. I think the first is that the Board's not disputing that tribes have a sovereign authority, an inherent sovereign authority, here confirmed also in a treaty, to establish regulations with respect to nonmembers who enter on their land in consensual relationships. So that's not really... that's established in Montana, but it's not really disputed in this case, I don't think. However, I think what is disputed and what Coeur d'Alene helps resolve and resolve with principles that are, in fact, taken from various Supreme Court cases, is when, you know, it's one thing to say there's this broad sovereign authority that tribes enjoy and, as I said, the Board does not dispute. But it's another to say that Congress must expressly ab... excuse me, expressly abrogate a particular attribute of that sovereignty in order for federal laws to apply. So because the federal government... Is that what Montana says? I mean, you're just telling me that, yes, you agree that they fall under at least one, if not both of the exceptions of Montana, and you say that doesn't matter. I don't think it doesn't matter. I think that what I'm saying is it's also undisputed that the federal government is a superior sovereign and Congress has plenary authority to modify or abrogate Indian rights. Of course. Everyone agrees with that. Right. And so I think that although Tuscarora is unnecessary to establish, Tuscarora is an example of the Supreme Court recognizing that when Congress enacts legislation like the National Labor Relations Act with a clear intent to use its entire jurisdiction and establish a uniform policy for the entire nation, that includes the entire nation, including Indian tribes, but there are certain attributes of Indian sovereignty that are so core to self-government under Hicks. That's not what Montana and Hicks say, is it? They don't say you can abrogate sovereignty as long as it's a certain kind of their sovereignty. They said if you fall within this definition of what constitutes their traditional grounds of sovereignty, then you have to have to express an unclear statement before it can be abrogated. Isn't that what they said? No. Well, I think that many Supreme Court cases, including, for example, Mescalero, recognize that there are different gradations of sovereignty and that different interests are considered. And, you know, so and then there's sort of an idea of concurrent jurisdiction, if you will. So it's not a question of the tribe not having authority to regulate on its reservation, but it's a different thing. It's a bigger leap to say now the tribe can condition your presence on the reservation on you forfeiting your federal, your uniform national federal rights, or to say that the tribe can legislate, you know, in contradiction to a law like the National Labor Relations Act, which preempts the field, as the Supreme Court has recognized. But you seem to be arguing policy about what Congress should be able to do as opposed to addressing the question what Congress did. I mean, you're making this assertion that Congress intended this to apply to Indians. But where's the support? And hasn't there been a standard established that says that it has to be clear that we're not going to presume that Congress intended to do this, that we want to see that they intended to do it? Well, so I think there are two questions. The first question of what Congress actually intended to do in an act of the National Labor Relations Act, I would argue, is a question that Congress actually specifically empowered the board to decide as to which the board is entitled to deference, and it's specifically in its interpretation of the act. It doesn't get to Chevron deference until first you have done, employed all the appropriately governing standards of interpretation to determine that there's actually an ambiguity, right? And the only ambiguity we're looking for here is was there a clear and plain statement. So is it ambiguous that it's clear and plain? There is not a clear and plain statement about the tribes in the National Labor Relations Act or in legislative history, and the board doesn't dispute that. However, the board did look, you know, and I don't know that the board necessarily finds the act ambiguous so much as, I mean, the plain language does apply to tribes, but the board did also look, you know, again, at the intent of Congress to apply it nationally. But I want to get back to the clear and plain statement. Again, I think that it's clear under the Supreme Court cases, under a number of cases the court recognizes that there are elements of sovereignty, sovereign immunity, the right to make their own laws and be ruled by them, which has to do, as recognized in Kirtland, with governmental type of functions directed inward towards the tribe. That's all the Ninth Circuit. I mean, the Supreme Court did say that there are different kinds of activities that don't fall within the exceptions of Montana. I mean, they're relatively narrow exceptions. They do cover, would seem to cover commercial activity, but they're relatively narrow. That's why you have all those Supreme Court cases in the criminal context talking about entirely different ability to regulate individuals who come onto the land in connection with their freedom. But that's a different, that's a very different question, isn't it? Yes, but respectfully, I think that the body of Supreme Court Indian law is simply not as black and white as that. There are cases, I mean, Mescalero, for example, specifically talks about, and this is in talking about a state assertion of authority where states are not, in fact, superior sovereigns the way that the federal government is, but even then the court recognizes that at times the states can take actions and exert their authority in ways that will impair aspects of Indian sovereignty, sometimes even without congressional authorization. I mean, and again, in Cabazon, which is obviously a case that's discussed a lot in the briefing here, in that case, which was also about obviously state authority, the court specifically referenced it, and I think this is around footnote 17, the court specifically contrasts the per se rule that bars any state taxation of the tribes with the more balancing analysis of state assertion of authority over reservation land, and particularly over nonmembers, but even sometimes over tribes. So Mescalero and Cabazon as two examples, and I believe also Parker, recognize that there are times that states in those cases, but again, the federal government is superior, states can at times exert authority over Indian tribes without clear and plain view with consensual relationships between nonmembers and the tribes themselves. Those cases don't address those questions. Well, I mean, in fact, I mean, Mescalero was talking about a situation where people were coming in from off the reservation to enjoy a hunting resort, and Cabazon, of course, was also about tribal gaming. I mean, Bracker was about, I think, logging operations, and I don't remember the exact tribal, non-tribal breakdown, but I think there were non-tribal companies, but all those cases do speak about whether they were on tribal land or not, right? Those were all on tribal lands. Those were not cases about fee lands in reservations. So Montana and, excuse me, Mescalero and Cabazon were on tribal lands, and again, the court has recognized that even on tribal lands, even where tribes clearly do have authority in isolation to act, that at times the other domestic sovereigns also can act, and it doesn't always require express congressional abrogation. And I do want to, I mean, congressional intent is, in fact, what we're looking at here, but, you know, It doesn't require express sovereign abrogation. What standard or what method do we look at then for assessing and characterizing the action in that circumstance? The action subject to regulation. Right. So, well, again, I would suggest that what Kirtland and the several other circuits who followed it, and then the District of Columbia, which did not adopt the Kirtland standard, but did enforce the board's San Manuel decision, all of those cases look at sovereignty and express that it is the strongest and has been the most protected and requirements and abrogation have been enforced. In Supreme Court cases where it is the right to make the tribes own laws and be ruled by them, so cases that specifically are either entirely intramural or tend to have, so like Fond du Lac was an entirely intramural dispute, which the Eighth Circuit emphasized, or in cases that involve governmental functions, you know, or some combination of the two, but as the tribe reaches out to You are relying on this distinction in your mind between governmental and commercial? Well, I think that's part of the distinction, but it's a little bit more nuanced than that because But the Supreme Court's never really recognized that distinction. Well, I would say that actually the Supreme Court I think the Supreme Court has actually not recognized it in the context of a Kirtland-type standard, but the Supreme Court has discussed in many cases the fact that a tribe at times may act as a sovereign and at times may act as a landowner or a commercial partner or in a proprietary manner. And so Marion is an example of that. But they distinguished sovereignty from landownership. Sovereignty is a broader concept than your allowance. Governmental activity isn't the breadth of their sovereign rights. And I don't mean to suggest that it's the breadth. I guess what I'm suggesting is it's the core, the sort of inviolable core that we need to be sure that Congress expressly abrogated. In Marion, what the Court did discuss was that we can abrogate all of those treaty rights as long as they're not acting in a governmental function. Well, a treaty right, again, is something that requires express abrogation, the way that sovereign immunity does or the core governmental inward-looking. In Santa Clara, the Supreme Court talked about attributes of membership, for example, of the political body. Even when the Tories accept your proposition that maybe the treaty right here is not as explicit as would be necessary to be standing alone enough for us to say that this act does not apply, the treaty right can't be ignored in defining the scope of their sovereignty, can it? No. Treaties, and the Board absolutely acknowledges treaties in this test. It is the second prong of the Kirtland test, and treaties are meaningful. However, in this case, the treaty right, which, and by the way, the Board applies the preeminent canon in interpreting treaties as it must. But in this case, because of the reserved right doctrine, which I believe is uncontested in this case, it's understood and the Supreme Court has made clear that what a treaty does is reserves rights that it does not cede. And so here it reserved the right the Board has agreed with the tribes experts to exclude and to self-government, but it did not in any way make them more explicit or any, you know, it restated them. And so the Board agrees that, and so it didn't change the analysis from the inherent rights. In other words, they had the inherent right to exclude and to self-government, and the treaty preserved that. It reserved it, but it did not augment it the way that, for example, in Navajo Forest, that treaty didn't only preserve the right to exclude, but it had a specific provision, as the court explained, I think the Tenth Circuit explained, that said that federal government officers could not even enter the reservation without it. The tribe has the same rights under this treaty as it would have, even if the treaty didn't have that language about exclusive use. That somehow that's part of the sovereignty right and they don't even need the treaty to have that right? Yeah, I think that the tribe has its general sovereign rights, including the right to exclude from its land. The treaty, I guess the difference the treaty makes is, of course, it has defined the boundaries of the land, but it doesn't add something like in the Navajo Treaty where it says federal officers can't enter without authorization to deal with Indian affairs, under which the Tenth Circuit said, okay, well now OSHA officers can't, inspectors can't enter to enforce that act, because that treaty didn't just reserve and preserve the right to exclusion, it went further. Can I make a final point? Go ahead. I'm sorry, I see my time is up, but the thing is that obviously the board can't be expecting to see a treaty that says the National Labor Relations Act will not apply, because treaties ended in 1871, long before the National Labor Relations Act, but there are treaties like the Navajo Treaty that say things about, for example, restricting the power of the federal government to enter the reservation. There are treaties that contain more specific rights. This treaty adds nothing more to the strength of their sovereignty claim. No, the treaty reinforces their sovereignty and does define the boundaries of their reservation, but without a more specific statement that would restrict federal government power, the right to exclude does not incorporate the right to exclude necessarily federal government officers acting under a statute that applies. Well, it's not federal government officers, it's members of the public that they want to make sure that they agree to certain guidelines before they... Right, and what... Go ahead. What the board found was that where the federal government has, in the National Labor Relations Act, but also in arguably several other protective acts for both employee rights, consumer rights, safety issues, when it has legislated nationally, like in the Safe Drinking Water Act and Phillips, to cover the nation, that it has covered the tribe, and that unless it impairs a core sovereign right to self-government, then when the tribe invites the public to a large commercial facility outward reaching into interstate commerce, which is precisely what the National Labor Relations Act... Doesn't that neatly turn the law on its head by presuming it applies? I think it doesn't, and this is why we do get back to congressional intent always, because Congress, again, it is totally undisputed, can affect sovereign rights if it wants to, and so what the Kirtland Standard recognizes is that when there is this type of clear intent to apply nationally and uniformly, then you look at whether the particular rights require abrogation, but there's also the third Kirtland Standard which isn't at issue in this case, but does say, wait, even when we have a national act like that that seems to be uniform and Congress seems to intend to apply it everywhere, if there's some indication that it really wasn't meant to apply to tribes, then we still won't do it. So it doesn't... That's exactly turning all the presumptions on their head. But that's only after we have satisfied the first requirement that there be congressional intent to apply it in the first place. You don't even reach the Kirtland analysis unless you... And we haven't really discussed this. Kirtland's a nice liquor. We're not bound by that. We're bound by the Supreme Court. Absolutely not, but my suggestion is that what the Ninth Circuit did in Kirtland and what the Seventh Circuit and the Second Circuit and the Eighth Circuit and the Tenth Circuit and the Eleventh have all recognized in at least certain circumstances is that those Kirtland factors aren't just created out of thin air by the Ninth Circuit. Those are factors that recognize the types of gradations in Indian sovereign authority that runs through the body of Supreme Court cases that talks about, for example, in Mescalero, balancing the different interests, that talks about certain assertions of authority requiring expressed congressional authorization and certain assertions not requiring it. And I assume many of those are in state cases, but they talk about whether or not congressional authorization is required and they make clear that congressional authorization is not always required. So if we adopt your position, if we adopt your argument and agree with that, doesn't that really eviscerate the tribe's right to the very benefits of the treaty that it was intended to provide because it would eviscerate their right really to self-governance, wouldn't it, if we take broadly the position that you're arguing? I don't think it does because I think, again, what this test is very careful to preserve and what the board also added on with this additional discretionary test under which it has declined jurisdiction, for example, in Yukon-Kaskaskawan, over an enterprise that it could assert jurisdiction under Kirtland. But what this whole test recognizes is that there's a time when the tribe is acting on its reservation within its community, regulating disputes, for example, between tribal employers and tribal employees or determining its membership rights or any number of things. And those things are untouchable unless Congress does it on purpose, as it did, for example, in Iqra, but it did so without providing a private cause of action in order to limit its effect. Whereas when a tribe, as here, establishes a huge commercial enterprise that is outreaching, outward-looking outside of the tribe, outside of the reservation, brings in almost all of its employees and customers from outside the reservation and operates in interstate commerce in our national economy, the idea that tribal sovereign... Well, that's not a policy argument that you should be making to Congress and you should say to Congress. You should expressly include Indian tribes. You should expressly abrogate their sovereignty to the extent necessary to apply this statute. Why are we doing this? This is all policy arguments you're making. And they're policy arguments that fly in the face of the policy arguments that, for years, have underlayed all of this Indian law. I would argue it's really not strictly a policy argument about which rules I think should apply. My argument is that in order to engage in the way that a tribal enterprise like this engages in our national economy and our national fabric, that Congress has determined not just in the National Labor Relations Act but in OSHA for safety at work, in all of the various discrimination laws, in all sorts of ways, consumer safety, consumer protection, Congress has set forth a certain number of standards that it has set forth in what Tuscarora referred to as generally applicable statutes that Congress intended, and the Supreme Court has found it intended, to legislate in its broadest jurisdiction to create a national standard. And that protects all citizens and, for that matter, foreign visitors when they go to a large public accommodation in the national economy like this. And that's what Congress intended. So now, when you have application of a statute like this to exactly the type of enterprise that Congress intended to apply it to, and where that application is here does not impair the tribe's right to make its own rules and be governed by them. Fine. I mean, you're arguing for, basically, a different way of looking at it, which was expressed in Purdue. That's true. I have one other question. You're making a lot of this third prong, this discretionary prong. Wouldn't the position of the Department of Indian Affairs be relevant to that? I mean, when you're talking about whether this applies, doesn't it matter that the federal agency in charge of these relationships says it doesn't apply? Well, since the Board has set forth the San Manuel Standard, it's now, to this point, applied it to four casinos. It also declined jurisdiction in the other case, but it has applied it four times. In none of those cases before the Board or in this Court of Appeals or in the D.C. Circuit did the Department of Interior ever participate and state its position. If the Department of Interior had stated its position formally to the Board, you know, then... I was under the impression the Department of Interior sent letters to the Board saying, we don't think you have jurisdiction. Please reevaluate your position. I believe, and I don't want to get this wrong, but I think they may have attached them. I believe that the Department of Interior may have sent letters at certain points to different general counsels of our agency, but, of course, the Board is divided into prosecutorial and an adjudicatory function. I am not aware that when the National Labor Relations Board has adjudicated any of these jurisdictional cases, I am not aware of the Department participating. I do know that in the Little River case, which is currently before another panel in this circuit, that the Department of Interior requested permission to appear as an amicus before the Board, and the Board granted that, but it chose not to file a brief. So the Board has not had the benefit of the Department of Interior's position in these adjudications. And what stage is the Little River case in? Well, we had a similar issue in that case with the Noel Canning decision. That case had been, before Noel Canning came down, fully briefed and argued. We did not enter a stipulation to submit the case, but when opposing counsel filed a 28-J letter, I was very confused because I didn't think we had any briefs before the court. So I called the court, and the clerk represented to me that it is before the panel for decision. I asked if the parties would be officially informed of that. She told me they would. I have never received – we have never received any notification. So I'm acting under the assumption that the panel is considering that decision, but it's possible we're about to rebrief it. Okay. Thank you. Are there any questions? Any others? Any other questions? Okay. Thank you very much. Thank you. If I may, I'd like to go back to the discussion that we were having with – Can you keep your voice up, I'm sorry? Yep. Go back to the discussion we were having about Montana and how, you know, does that apply? Is it instructive in this case? I've always looked at Montana as a filter for sorting, more of how tribal jurisdiction and state jurisdiction interact, not a question of has a treaty right been abrogated. So I think although it's very helpful in this context, because it does go into that discussion of consensual relationships and sorts out kind of when the tribe can exercise its jurisdiction, I think it's a different issue here when we're looking at has Congress used clear and express language to abrogate a tribe's treaty rights or sovereign rights with respect to application of a particular act. That's where the Supreme Court's test of clear and plain statement is so vital. But with respect to whether the tribe is making its own laws and allowing to take care of the general welfare of its members, that's exactly what the Saguaro Tribe was doing in this case. It was when it tried to exercise its right to exclude by removing a person who had knowingly violated its laws, the board said you can't do that. And it ordered the tribe to allow her back. And when the tribe tried to use its right to govern the relationships between its employees, the board said you can't do that in order to cease and desist from this lawmaking. So those are the promises that the board is trying to break here today. And with respect to Tuscarora, you point out that the majority said there was no treaty that it was dealing with. But I think if you look at the whole opinion, there was enough there dealing with sovereign rights and the place that these Indians were possessing that the court thought it needed to apply the clear and plain statement rule. And that's why it did so in that case. I'm sorry, you're dropping your voice. I'm having trouble hearing you. Were you just talking about Tuscarora or a different case? I went back to Tuscarora to say why they were applying the clear and plain statement rule in that case. So I think those are the differences that if you looked to see did they analyze the statute, was there an indication that Congress was considering that abrogation, they found that there was. And there was enough going on between the dissent and the majority to think that they needed to assume that it was close to being a treaty. And that's why they did the analysis that way. Why do you think the Coeur d'Alene framework isn't the appropriate framework? Because it doesn't give the proper respect to what it takes to abrogate the tribal rights and whether Congress has spoken for that. It seems that that's what the board would say it's going to apply, but I don't think the board's ever come across a treaty that it thought was worthy of those exceptions or worthy of stopping the application of the act. You know, I think it really comes down to the promises that were made for some of these treaties and the fact that the board is seeking to break those promises and it's actually in this court's blessing to do that. Justice Black spoke to that in Tuscarora, too, when he said great nations should keep their word. And how long should those promises last? Well, isn't it less about that than whether Congress did break its word? Congress can change the terms. That's the point I raised, but they have to do it. Silence alone can't do that. So the question is, your real point is that Congress can break its word, but the NLRB can't. It can't make that decision. It's the fox in the henhouse that Scalia was talking about in one of the more recent Chevron cases, Arlington. You can't let the agency make that determination. It's Congress's job to do that. And as Justice Black pointed out again in Tuscarora, how long should these promises last? He uses the words of statesman and Senator Sam Houston saying, as long as the waters flow and the grasses grow upon this earth, as long as the sun rises to lighten your pathways, as long as these peoples handle their fires, that's how long the promises of the United States should last. Thank you. Thank you. Thank you both. It's been very helpful. The case will be submitted.